**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

WEN QIN ZHU,                     )
                                     )
       Plaintiff,            )
                                       )
v.                               )        NO. 3:06-0460
                                     )        JUDGE HAYNES
THE VANDERBILT UNIVERSITY,    )
d/b/a VANDERBILT UNIVERSITY    )
MEDICAL CENTER,              )
                                     )
       Defendant.         )

## M E M O R A N D U M

Plaintiff, Wen Qin Zhu filed this action under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 et seq., against the Defendant, Vanderbilt University Medical Center ("VUMC"). Plaintiff's claims are that the Defendant terminated her based upon her pregnant status and her national origin and then retaliated against Plaintiff for taking FMLA leave. The Defendant filed an answer denying Plaintiff's allegations and the parties proceeded with discovery.

Before the Court is Defendant's motion for summary judgment (Docket Entry No. 25), contending that under the proof and the applicable law, there are not genuine material factual disputes. In its motion for summary judgment, the Defendant assumes that Plaintiff can make a prima facie showing of pregnancy discrimination, but argues that under the undisputed facts, Plaintiff was counseled on numerous occasions about her job performance and her use of her work computer for non-work related matters and was terminated for these reasons. Because these circumstances occurred prior to the Defendant's being informed of Plaintiff's pregnancy,

these reasons cannot be pretextual. The Defendant argues that Plaintiff's proof cannot establish a causal connection between her FMLA request and her termination.

In her response (Docket Entry No. 35), Plaintiff contends that material factual disputes arise from the credibility of witnesses and whether Plaintiff had time to perform her assigned duties.

From the reasons set forth below, the Court concludes that Plaintiff lacks proof that the Defendant's stated reasons for her termination were pretextual. Plaintiff's proof of a personality conflict does not create a material factual dispute under the circumstances of this controversy.

## A. FINDINGS OF FACT[1]

Vanderbilt University, a private, not for profit corporation has a number of schools and colleges, including a and medical center in Nashville, Tennessee. (Docket Entry No. 27, Hamm Affidavit at ¶ 2). Vanderbilt is divided into a number of schools and colleges, including the Medical School. Id. Within the Medical School, there are various departments, including the Department of Pharmacology ("the Department"). Id. The Chair of the Department of Pharmacology has been, at all times relevant hereto, Dr. Heidi Hamm. Id.

VUMC first hired Plaintiff in 2001 to work as a Research Fellow in the Department of Nephrology. (Docket Entry No. 36, Plaintiff's Response to Defendant's Statement of

---

[1] Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). The Court concludes that there are not any material factual disputes. Thus, this section constitutes finding of facts under Fed.R.Civ.P. 56(d).

Undisputed Fact at ¶ 3). At that time, Plaintiff performed work for Dr. Roy Zent. Id. at ¶ 4. Plaintiff worked for Dr. Zent until October 2002, at which time, she left the United States and returned to China. Id. On January 5, 2004, upon Dr. Zent's recommendation, Dr. Hamm recruited and hired Plaintiff to be a research assistant. Id. at ¶ 5. Dr. John H. Cleator, a Cardiology Fellow was Plaintiff's supervisor on Dr. Hamm's project. Id. at ¶ 6.

In May 2005, Plaintiff worked on a grant project with Dr. Michael Holinstat, a visiting Research Fellow. Id. at ¶ 7. In her work with Dr. Holinstat's grant, Plaintiff's primary duties were to perform various tests, western blots platelet aggregation, Coomassie stains, silver stains, and to make buffers and to obtain blood. (Docket Entry No. 32-9, Holinstat Deposition at p. 7). Because this work did not require a full work day, Plaintiff's supervisors asked Plaintiff to get additional assignments from Karren Hyde, the laboratory manager. Id. at pp. 11-12. Dr. Holinstat and Hyde were Plaintiff's direct supervisors. (Docket Entry No. 36 at ¶ 9).

In the spring of 2005, Hyde and Dr. Holinstat observed that Plaintiff was frequently absent from the laboratory without explanation and spent an excessive amount of her working hours on her work computer visiting non-work related web sites. (Docket Entry No. 27, Hamm Affidavit at ¶ 5). When confronted about her behavior, Hyde and Dr. Holinstat deemed her reaction belligerent. Id. On June 1, 2005, Dr. Hamm, Hyde and Dr. Holinstat sent Plaintiff a warning letter on these performance issues that served as a warning in the first step in Vanderbilt's progressive discipline process. (Docket Entry No. 36 at ¶¶ 20-21). Although Plaintiff signed the warning letter, she states that she did not read the letter carefully and was unaware that this was a warning under VUMC's disciplinary rules until later. Id. at ¶ 22. At that time, VUMC had not been informed of Plaintiff's pregnancy. Id. at ¶ 23.

3

After that warning, Plaintiff continued inefficient use of her time and on September 12, 2005, Dr. Holinstat provided Plaintiff with job duties for the week. Id. at ¶ 24. In Dr. Holinstat's view, beginning September 12th, Plaintiff would have a minimum downtime of 11.5 hours based on her work week for her assigned tasks. Id. at p. 25. Dr. Holinstat told Plaintiff that when she completed the assigned tasks, she was to ask Hyde for additional work assignments. Id. at ¶ 26. Plaintiff never sought additional work from Hyde because in her view, she did not have any downtime. Id. at ¶ 27. Based upon Plaintiff's completion of assigned projects, Dr. Holinstat believed Plaintiff did not make productive use of her time and spent an excessive amount of time waiting for blood samples to be collected by a designated employee rather than requesting assistance from another employee. (Docket Entry No. 28, Holinstat Affidavit at ¶ 5). Again, Dr. Holinstat considered Plaintiff's to be inefficient in her use of time. Id. at ¶ 6.

On July 26, 2005, Plaintiff disclosed that she was pregnant and informed Dr. Hamm by email that "I am pregnant!". (Docket Entry No. 36, Plaintiff's Response to Defendant's Statement of Undisputed Fact at ¶ 11). Dr. Hamm who was on vacation at the time of the July 26th email, does not recall having received the email. (Docket Entry No. 27, Hamm Affidavit at ¶ 7). Dr. Hamm first learned of Plaintiff's pregnancy in October 2005. (Docket Entry No. 32-8, Hamm Deposition at p. 13). For purposes of this motion, Defendant does not dispute Plaintiff's testimony that Dr. Hamm had notice of her pregnancy in July 2005. Plaintiff admits, however, that she did not disclose her pregnancy to Hyde until September 23, 2005. (Docket Entry No. 36, Plaintiff's Response to Defendant's Statement of Undisputed Fact at ¶ 12).

While Plaintiff was on her first FMLA leave, Plaintiff's was suspended until her return to

4

work. On September 23, 2005, Dr. Hamm, Dr. Holinstat and Hyde presented Plaintiff with her first written Performance Improvement Counseling ("PIC") based upon her unproductive use of her time during the previous week and her failure to adhere to the VUMC "credo" that sets performance and behavior standards and goals for all VUMC employees. (Docket Entry No. 30, Hyde Affidavit at ¶ 8). The September 23rd PIC was based on Drs. Holinstat and Hamm's joint belief that Plaintiff did not perform standard laboratory techniques timely and failed to fill her downtime with additional assignments from Hyde. (Docket Entry No. 28, Holinstat Affidavit at ¶ 7). Upon her return on December 16, 2005, Plaintiff's PIC review date was extended for four weeks to account for the time she was out on leave of absence. (Docket Entry No. 30, Hyde Affidavit at ¶ 13).

On October 26, 2005, Dr. Holinstat asked Plaintiff to conduct an experiment and later learned that Plaintiff had not followed the proper protocols for this experiment. (Docket Entry No. 36, Plaintiff's Response to Defendant's Statement of Undisputed Fact at ¶¶ 33-34). Plaintiff admits that she let the samples sit on ice during her lunch break that is an improper procedure for this experiment. Id. at ¶ 34. Plaintiff, however, insists that Dr. Holinstat did not give her a protocol that precluded a lunch break. (Docket Entry No. 32-2, Zhu Deposition at p. 35). Because the samples were on ice for more than the recommended time, the results were deemed unreliable. (Docket Entry No. 36, Plaintiff's Response to Defendant's Statement of Undisputed Fact at ¶ 35). Dr. Holinstat also discovered that Plaintiff failed to follow established protocol for his experiments for about one and one-half months and considered that experiment data compromised, resulting in six weeks of lost work. Id. at ¶ 36. In November 2005, Plaintiff did very little work for Dr. Holinstat and was assigned general laboratory work and experiments for

5

Hyde. Id. at ¶ 37.

Plaintiff requested and received FMLA leave on November 17, 2005, due to her nausea caused by her pregnancy. Id. at ¶ 13. Hyde was unaware that Plaintiff's absence was due to FMLA leave. (Docket Entry No. 30, Hyde Affidavit at ¶ 11). Because Hyde did not know when or if Plaintiff would be returning to work, she cleaned Plaintiff's work station and removed the solutions or buffers Plaintiff left in bottles on her workstation. Id. Hyde also boxed up Plaintiff's files and personal belongings to create space for a visiting lab scholar, Dr. Joseph Parello. Id.

On November 20, 2005, while on FMLA leave, Dr. Holinstat found Plaintiff and her husband using the computer in the Department's laboratory after hours. Id. at ¶ 38. Plaintiff stated that she was "checking her email", but Dr. Holinstat did not believe it was appropriate to be at her station after hours if she was too sick to report to work during the day. Id. at ¶ 39 and Docket Entry No.28 , Holinstat Affidavit at ¶ 9. The next day, Plaintiff's email access was turned off, but restored by Nannette Vaughn, an employee relations representative in Vanderbilt's human resource services department the same day. (Docket Entry No. 36, Plaintiff's Response to Defendant's Statement of Undisputed Fact at ¶ 41).

On November 23, 2005, Plaintiff filed a grievance with VUMC's Opportunity Development Center (ODC), that investigates complaints of discrimination by VUMC employees. Id. at ¶ 42. Plaintiff's grievance alleged that her department discriminated against her based on her pregnancy when the department issued the PIC in September, 2005. (Docket Entry No. 32-4, Exhibit 11 thereto, Vanderbilt University Grievance Form). Plaintiff did not mention her national origin or retaliation for her FMLA leave. Id. Plaintiff returned to work on

6

December 16, 2005. Plaintiff did not have to purchase any test tubes, but had to reequip her workstation and was paid for that time. (Docket Entry No. 36, Plaintiff's Response to Defendant's Statement of Undisputed Fact at ¶ 17).

On December 29, 2005, Hyde and Connie Stenquist, the department's administrative officer, met with Plaintiff to discuss her continued use of her computer to visit non-work related web sites during work hours. Id. at ¶ 46. A review of the hard drive on Plaintiff's computer revealed "cookies" from various non-work related internet sites. Id. at ¶ 47. Plaintiff denied accessing these sites. Id. The entire operating system on Plaintiff's computer had to be rebuilt because it was so infected with spyware from the internet. Id. This was the second time Plaintiff's computer had to be rebuilt. Id. at ¶ 48. Gordon Borck, the department's technology manager, informed Dr. Hamm that the number of viruses on Plaintiff's computer was extremely rare, and almost certainly the result of extensive surfing on non-work related web sites. Id. at ¶ 49.

On January 3, 2006, another meeting was held between Hyde, Stenquist and Plaintiff because Plaintiff refused to clean gel plats at Dr. Holinstat's request. Id. at ¶ 50. Plaintiff was informed that she was expected to perform general duties for anyone who asked if the person making the request worked in Dr. Hamm's laboratory. Id. at ¶ 51. On January 20, 2006, after an investigation, the ODC concluded that the evidence was insufficient for any violation of Vanderbilt's Affirmative Action and Equal Opportunity Policy (HR-001). (Docket Entry No. 36, Plaintiff's Response to Defendant's Statement of Undisputed Fact at ¶ 44).

On January 23, 2006, Dr. Hamm and Hyde presented Plaintiff with a final PIC for her failure to follow supervisory instructions, rude and unprofessional conduct and unproductive use

of her work time.  Id. at ¶ 52.  A final PIC has a duration of six months.  Plaintiff refused to sign her final PIC.  The specific incidents listed in Plaintiff's final PIC include:

> November 2, 2005, you had previously been asked to contact either [Holinstat] or [Hyde] to get work assignments...[Hyde] had not assigned you any work for over a week as you did not come to [Hyde] after completing your assignments or when you had downtime...you were repeating an experiment.  This work was not expected or assigned. Additionally, [Holinstat] determined that you had not followed an established protocol for his experiments for approximately 1 ½ months which has compromised his data.

> On November 3, 2005, you were asked to prepare minipreps and you said that you would do them later... Later this afternoon, you asked about the minipreps and [Hyde] told you that [she] had already done them. [Hyde] informed you at that time that your inefficient use of time makes it difficult to work with you. You proceeded to yell and call [Hyde] a liar...

> On December 28, 2005, your Cookie folder showed 36 sites unrelated to work from 3:16-5:08 p.m.  On December 29, 2005...a few minutes before 10 a.m....[Hyde] asked what you were doing.  You stated you were working in Quickbase...since you arrived at work (8:23 am. per timesheet). According to your Cookie folder, you had not logged into Quickbase that morning until 9:56 a.m. and that 20 cookies from sites unrelated to work were posted from 9:24 a.m.-10:51 a.m..

> *    *    *

> You set up PCR reactions for a mutagenesis... [Hyde] asked you if you wanted to set this up yourself according to the manual or if you wanted [Hyde] to instruct you in this.  You stated that you could do it..you came to the machine with your samples in a rack at room temperature. [Hyde] asked you if you had set the entire reaction at room temperature.  You replied that you had set up the entire reaction at room temperature.  Standard procedure for PCR is always to set up on ice or 4°C.

> [Hyde] asked you at this time if you kept a notebook and you replied that you did not. [Hyde] instructed you to keep a notebook as standard procedure for a research assistant.

> On January 3, 2006, Michael Holinstat asked you to clean a set of gel plates he had found in the coldroom.  You stated that they were not your gels and Michael again asked you to clean the plates.  You walked away without answering him...you are to work as an assistant in the Hamm lab and you should have

8

responded more appropriately to the request. Additionally, you had been previously advised by [Hyde] of this expectation, in the presence of Connie Stenquist, of Dr. Hamm's expectations of you as an assistant in her laboratory concerning assistance to others on December 16, 2005.

(Docket Entry No. 32-6, Exhibit 20 thereto, PIC Form). Plaintiff received a second FMLA leave on January 24, 2006 and returned to work on March 28, 2006. (Docket Entry No. 36, Plaintiff's Response to Defendant's Statement of Undisputed Fact at ¶ 18).

Upon Plaintiff's return from her second FMLA leave in March 2006, Hyde and Dr. Hamm remained disappointed with Plaintiff's work performance. (Docket Entry No. 30, Hyde Affidavit at ¶ 21). Hyde worked with Plaintiff on a one-on-one basis on a particular project and concluded that Plaintiff lacked the skills and experience listed on her resume. Id. In addition, Dr. Hamm concluded that Plaintiff lacked very basic scientific knowledge, citing that Plaintiff did not know that capital "K" is the common scientific designation meaning 1000 when notated as shorthand for centrifuge speed. Id. Plaintiff also did not know the differences between a low-speed, high-speed and ultra-high speed centrifuge, common instruments in a research laboratory. Id. On April 7, 2006, Plaintiff was given her yearly performance evaluation and her scores reflected her performance issues over the past year. Id. at ¶ 22.

On April 24, 2006, Plaintiff was conducting an experiment requiring the use of an ultra-centrifuge but after Plaintiff started the centrifuge and before reaching the required speed, the imbalance light came on. Id. at ¶ 23. Plaintiff reported to Hyde that something was wrong with the centrifuge. Id. Upon inspection, Hyde saw that the imbalance light was on and the centrifuge was not running. Id. Hyde then opened the centrifuge and found the o-ring outside of

9

rotator.  Id.  The o-ring (a rubber gasket around the underside of the lid of the rotator)[2] was broken.  Id. Hyde took the rotor out of the centrifuge and pulled out the centrifuge test tubes.  Id.  About half of Plaintiff's sample tubes lacked liquid inside the rotor or on the chamber.  Id.  Hyde could not determine by looking at the centrifuge exactly what had taken place and reported the incident to Dr. Hamm.  Id.

Due to Plaintiff's continued performance issues, including the centrifuge incident, Dr. Hamm decided to terminate Plaintiff's employment on April 26, 2006.  Id.; Docket Entry No. 27, Hamm Affidavit at ¶ 14.  VUMC progressive discipline policy authorizes termination for any performance issue within six months of a final PIC.  Id.  In the termination letter, Dr. Hamm mistakenly referred to the samples in centrifuge as "GST fusion proteins."  Id. at ¶ 15.  Dr. Hamm also stated that Plaintiff "let the centrifuge remain on for one hour once the imbalance light came on, endangering a very expensive piece of equipment."  Id.  Despite these factual errors, Dr. Hamm remained of the view that Plaintiff had problems operating the centrifuge.

The centrifuge incident was one incident of a series of Plaintiff's performance problems and was not the sole basis for Plaintiff's termination.  Id.  After the decision to terminate Plaintiff's employment, the service operator informed Hyde that if the o-ring was improperly in place outside of its groove, compression and tightening may cause the rotor lid to break and be thrown out of the rotor.  According to the serviceman, because the chamber is under vacuum and the rotor is not, samples inside the centrifuge could vaporize.  (Docket Entry No. 30, Hyde Affidavit at ¶ 24).  Pre-run checks are required before using the centrifuge and if conducted

---

[2] During her deposition, Plaintiff was not familiar with the term "o-ring" however the rubber gasket to which she referred in her deposition is in fact the o-ring.  (Docket Entry No. 32-5, Plaintiff Deposition at pp. 149-151; Docket Entry No. 30, Hyde Affidavit at ¶ 23).

10

would likely have revealed that the o-ring was not properly in position. Id. Plaintiff admitted during her deposition that she did not inspect the "gasket" before she used the centrifuge. (Docket Entry No. 32, Plaintiff's Deposition at 151).

Plaintiff asserts that during her pregnancy, she was required to perform functions that a pregnant woman could not perform. On September 23, 2005, Hyde asked Plaintiff to stock the shelves in the culture room which required that Plaintiff stand on a stool or stepladder. Plaintiff protested because she could not stand on the ladder due to her pregnancy and asked Guihua Liao, a research assistant in Dr. Hamm's laboratory, to stock the shelves for her. Plaintiff was not disciplined for refusing to stock the shelves or seeking Liao's assistance. (Docket Entry No. 30, Hyde Affidavit at ¶ 9). Plaintiff concedes that she did not have any work restrictions until November 28, 2005. (Docket Entry No. 32, Plaintiff's Deposition at 79-81). By that date, Plaintiff's work restrictions were no lifting more than 10 pounds, no standing on ladders or elevated structures requiring balance. Id. at 80. Despite these work restrictions, Plaintiff was observed attempting to lift several cases of C-fold towels and place them on a cart and Hyde reminded Plaintiff of her lifting restriction. (Docket Entry No. 30, Hyde Affidavit at ¶ 10).

Plaintiff next asserts that VUMC in effect, forced her to take her second FMLA leave because her supervisors instructed her to perform experiments with SF9 cells that could result in exposure to baculovirus, a benign insect virus. Id. and Docket Entry No. 1 at ¶ 8. VUMC insists that humans who work with baculovirus are not at risk. (Docket Entry No. 32-8, Hamm Deposition at 22). There are not any biosafety level requirements and Plaintiff was not the only research assistant required to work with baculovirus. (Docket Entry No. 32-6, Plaintiff Deposition at 154-55; Docket Entry No. 32-7, Hyde Deposition at 8, 10; Docket Entry No. 30,

11

Hyde Affidavit at ¶ 14). Four other prople also worked with baculovirus, including Liao and Dr. Songhai Chen, a research assistant professor, who are both Chinese, and Eun-Ja Yoon, a graduate student and Korean national. (Docket Entry No. 32, Plaintiff's Deposition at 107-08; Docket Entry No. 30, Hyde Affidavit at ¶ 14).

The Department assigned Plaintiff to work on the SF9 project because: (1) Plaintiff's salary was being paid from funds derived from that grant; (2) because there were insufficient general laboratory duties for Plaintiff's work week; and (3) because some of the laboratory employees informed Dr. Hamm that they did not want to work with Plaintiff because they did not trust her work. (Docket Entry No. 27, Hamm Affidavit at ¶¶ 8, 10). Hyde provided Plaintiff with information concerning the safety and nature of baculovirus. (Docket Entry No. 32, Plaintiff's Deposition at 85; Docket Entry No. 30, Hyde Affidavit at ¶ 15). Due to her pregnancy, Plaintiff requested time to review the safety information with her obstetrician prior to her perfoming any work with baculovirus. Id. at 86. Vanderbilt agreed and asked her to meet with her doctor within a reasonable period of time. Id.; Docket Entry No. 30, Hyde Affidavit at ¶ 15.

On December 27, 2005, Plaintiff provided a note from Dr. Brown, her obstetrician, which stated that she should not work with baculovirus due to the unknown risk to pregnant women and her impaired immune state. (Docket Entry No. 32-4, Exhibit 14 thereto, Brown Note). The department honored Dr. Brown's instructions and Plaintiff was assigned to work on temporary projects for Dr. Cleator and Will Oldham. (Docket Entry No. 30, Hyde Affidavit at ¶ 15).

On January 3, 2006, Dr. Melanie Swift, VUMC's director of occupational health sought authorization to speak with Dr. Brown about the nature and safety of working with baculovirus.

12

(Docket Entry No. 29, Swift Affidavit at ¶ 2). Plaintiff responded that she would contact Dr. Brown's office and provide authorization for Dr. Swift to speak with him. Id. Work with baculovirus was a key function of Plaintiff's job and was related to the grant that paid her salary. Id. at ¶ 3. At VUMC's human resources department's request, Dr. Swift sent Dr. Brown an email notifying him that Plaintiff would request authorization to speak with her and in the interim, Dr. Swift provided Dr. Brown with information on the nature and safety of baculovirus. Id. at ¶4. Dr. Swift noted that baculovirus does not require review by the Institutional Biosafety Committee. Id. In her email, Dr. Swift also included a link with additional information regarding baculovirus. Id.

Dr. Swift and Dr. Hamm had additional meetings with Plaintiff for her authorization to speak with Dr. Brown. Id. at ¶ 5; Docket Entry No. 27, Hamm Deposition at 28. Each time, Plaintiff responded that she had been unable to contact Dr. Brown. (Docket Entry No. 27, Hamm Deposition at 28). Believing that Plaintiff was intentionally delaying speaking with Dr. Brown, Dr. Hamm contacted Dr. Brown's office and left a message for him to contact her. Id. On January 18, 2006, Dr. Brown returned Dr. Hamm's telephone call and Dr. Hamm handed the telephone to Plaintiff. Id.; Docket Entry No. 32-3, Plaintiff Deposition at 38. Dr. Hamm left the room in order to provide Plaintiff privacy. Id. During this conversation, Dr. Brown informed Plaintiff that baculovirus was not a danger to her or her fetus. (Docket Entry No. 32, Plaintiff's Deposition at 39). That same day, Dr. Brown sent Dr. Hamm a note stating that based upon his review of the literature on baculovirus, his opinion was that Plaintiff's work with baculovirus did not pose a risk to her or her unborn fetus. (Docket Entry No. 32-6, Exhibit 25 thereto).

Plaintiff refused to work with baculovirus despite clearance by her obstetrician, and Hyde

13

informed Plaintiff that she had to work with baculovirus or take FMLA leave. (Docket Entry No. 32, Plaintiff's Deposition at 39; Docket Entry No. 30, Hyde Affidavit at ¶ 20).

## B. CONCLUSIONS OF LAW

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment <u>sua</u> <u>sponte</u>, so long as the opposing party was on notice that she had to come forward with all of her evidence." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986). <u>Accord</u>, <u>Routman v. Automatic Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

In <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment `shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.
>
> <u>As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment</u>. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'"

14

Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in Celotex

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of `demonstrating the absence of a genuine issue of material fact,' the nonmoving party then `must set forth specific facts showing that there is a genuine issue for

15

trial.'" <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 353 (6th Cir. 1989) (quoting <u>Celotex</u> and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting <u>Liberty Lobby</u>). Moreover, the Court of Appeals explained that

> The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.'

<u>Street</u>, 886 F.2d at 1480 (cites omitted). See also <u>Hutt v. Gibson Fiber Glass Products</u>, No. 89-5731 (6th Cir. filed September 19, 1990) ("A court deciding a motion for summary judgment must determine `whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." quoting <u>Liberty Lobby</u>)).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, <u>summary judgment will not lie if the dispute about a material fact is `genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.</u>
>
> &ast; &ast; &ast;
>
> Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.</u> If the defendant in a run-of-the-mill civil case

16

moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- `whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:

[I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: `The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation

omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must

be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Company,

791 F.2d 43, 46 (6th Cir. 1986).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a

summary judgment motion:

A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).

17

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions

    1.    Complex cases are not necessarily inappropriate for summary judgment.

    2.    Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

    3.    The movant must meet the initial burden of showing `the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

    4.    This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

    5.    A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: `whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

    6.    As on federal directed verdict motions, the `scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

    7.    The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence,

must be satisfied by the respondent.

8.     The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.     The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.     The trial court has more discretion than in the `old era' in evaluating the respondent's evidence.  The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.'  Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted.  The trial court has at least some discretion to determine whether the respondent's claim is `implausible.

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

The Pregnancy Discrimination Act of 1978 ("PDA") amended Title VII to provide that:

the terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes...as other persons not so affected but similar in their ability or inability to work, and nothing in section 703(h) of this title [42 U.S.C. § 2000e-2(h)] shall be interpreted to permit otherwise.

42 U.S. C. § 2000e(k) (emphasis added).

19

To avoid summary judgment, Plaintiff must offer credible evidence that she was treated differently from non-pregnant persons who were similar in their ability or inability to work. <u>See e.g.</u>, <u>Ensley-Gaines v. Runyon</u>, 100 F.3d 1220, 1226 (6th Cir.1996).

A claim of discrimination on the basis of pregnancy is evaluated as a sex discrimination claim under Title VII. <u>Cline v. Catholic Diocese of Toledo</u>, 206 F.3d 651, 658 (6th Cir.2000). For a judgment on her claim, Plaintiff must present sufficient evidence to create an inference of discriminatory treatment. <u>Spann v. Abraham</u>, 36 S.W.3d 452, 464-65 (Tenn. Ct. App. 1999). Absent direct evidence, courts apply the <u>McDonnell Douglas</u> burden-shifting framework to a PDA claim. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 807 (1972); <u>Campbell v. Florida Steel Corp.</u>, 919 S.W.2d 26, 31 (Tenn. 1996).

In the absence of direct evidence of discrimination, Title VII claims are subject to a three-part, burden-shifting analysis: (1) the plaintiff must establish a <u>prima facie</u> case of discrimination; (2) the employer must articulate some legitimate, nondiscriminatory reason for its actions; and (3) the plaintiff must prove that the stated reason was pretextual. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973); <u>Accord Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981). The burden of persuasion remains with the plaintiff at all times. <u>Canitia v. Yellow Freight Sys., Inc.</u>, 903 F.2d 1064, 1066 (6th Cir. 1990).

For disparate treatment Title VII claim, the plaintiff's <u>prima facie</u> showing of disparate treatment requires proof that:

1. Plaintiff is member of a protected class;
2. Plaintiff suffered an adverse employment action;
3. Plaintiff was qualified for the position;
4. Plaintiff was treated differently than similarly-situated employees outside of the protected class for the same or similar conduct.

20

Abeita v. Transamerica Mailings, Inc., 159 F.3d 246, 252 (6th Cir. 1998). See also McDonnell Douglas Corp., 411 U.S. at 802. For discriminatory discharge claims, the McDonnell Douglas paradigm is slightly modified. See Morvay v. Maghielse Tool and Die Co., 708 F.2d 229, 233 (6th Cir. 1983); Potter v. Goodwill Indus., 518 F.2d 864 (6th Cir. 1975). To make a prima facie case of discriminatory discharge, the plaintiff must show that her discharge was "without valid cause, and that the employer continued to solicit applications for the vacant position." Id. at 865.

As to any disparate treatment claim, under Title VII standards, Plaintiff must show that the comparable employees are "similarly situated in all respects." Hollins v. Atlantic Co., Inc., 188 F.3d 652, 659 (6th Cir. 1999) (quoting Mitchell, 964 F.2d at 583). "'Precise equivalence in culpability between employees' is not required. Rather, Plaintiff must simply show that the employees were engaged in misconduct of 'comparable seriousness.'" Id. (quoting Harrison, 80 F.3d at 1115 & McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 283 n. 11 (1976)). Thus, the similarly-situated employees with whom Plaintiff seeks to compare her treatment must have "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell, 964 F.2d at 583.

The Sixth Circuit warned in Ercegovich v. Goodyear Tire and Rubber Co. that Mitchell should not be read so narrowly as to require a plaintiff to be identically situated to the non-protected employee in every single aspect of their employment. Ercegovich, 154 F.3d 344, 353 (6th Cir. 1998). For with such a narrow reading, "a plaintiff whose job responsibilities are unique to his or her position will never successfully establish a prima facie case...." Id. The employee and his similarly situated counterparts only need be similar in "all of the relevant aspects." Id. at 352.

21

In its motion for summary judgment, VUMC assumes that Plaintiff can establish a prima facie case of pregnancy discrimination, but VUMC asserts a legitimate and nondiscriminatory business reasons for discharging Plaintiff, namely her poor work performance, as reflected in the written warnings and counseling sessions given to Plaintiff for her inadequate laboratory work.

Plaintiff must submit evidence that Defendant's reasons for discharging her lack credibility or that the decision was likely motivated by a discriminatory reason. Burdine, 450 U.S. at 256. In Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir.1994), the Sixth Circuit held that to establish pretext a plaintiff challenging her employer's reasons for termination must show that the reasons either: (1) had no basis in fact; (2) did not actually motivate his discharge; or (3) were insufficient to motivate the discharge.

Plaintiff's proof is that after she became pregnant, she was unfairly disciplined, given an unsatisfactory performance evaluation, asked to perform tasks that a pregnant woman could not perform, was insufficiently trained, was yelled at by her supervisor, and falsely accused to damaging laboratory equipment. (Docket Entry No. 32, Plaintiff's Deposition at 25, 40-44). Yet, VUMC's problems with Plaintiff's work performance arose prior to VUMC's notice of her pregnancy and Plaintiff did not notify VUMC of her pregnancy until July 26, 2005.[3] Plaintiff received a counseling memorandum on June 1, 2005 for inaccurate reporting of her work hours; inappropriate, non-work related time on the computer; and failure to follow the directions of her direct supervisors. (Docket Entry No. 32-4, Exhibit 4 thereto, Letter from Hyde and Dr. Holinstat to Zhu).

The evidence is that VUMC discharged Plaintiff for her poor work performance and Plaintiff

---

[3] Plaintiff testified that Hyde asked her if she was pregnant in May 2005, however, Plaintiff admits that she did not respond to Hyde's inquiry other than to smile. (Docket Entry No. 32, Plaintiff's Deposition at 28).

22

has not raised any inference of pretext. Plaintiff admits that she did not complete Dr. Holinstat's assignments within the specified time frames, that she did not obtain additional laboratory duties from Hyde, that she did nto set-up the PCR reactions according to protocol, that she did not keep her notes in a notebook, and that she refused to clean a set of gel plates at Dr. Holinstat's request. (Docket Entry Nos. 32, Plaintiff's Deposition at 67-69, 31-32, 121-23). Accordingly, Plaintiff has failed to submit proof that VUMC's stated reasons are a pretext for her termination so as to create a triable issue of fact.

As to Plaintiff's poor performance evaluation, Plaintiff believes her performance evaluation is discriminatory because it was "unfair". (Docket Entry No. 32, Plaintiff's Deposition at 133). Disagreement with the employer's assessment of work performance cannot prove pretext. McDonald v. Union Camp Corp., 898 F.2d 1155, 1162 (6th Cir.1990) ("the fact that [the plaintiff] disagrees with [the employer's] assessment of his performance...does not render [the employer's] reasons pretextual"). Title VII does not require that employers make fair or accurate assessments of employees' abilities, absent discriminatory intent or impact. Mayberry v. Endocrinology-Diabetes Associates, 926 F.Supp 1315, 1323-24 (M.D. Tenn. 1996). The employer's motivation, not its business judgment is the controlling issue. Wrenn v. Gould, 808 F.2d 493, 502 (6th Cir.1987). Plaintiff has failed to offer any evidence, other than her own subjective belief, that she was given a poor performance evaluation based upon her pregnancy.

As to Plaintiff's claim about improper work tasks for a pregnant woman, when a supervisor requested that Plaintiff clean the shelf, Plaintiff did not have any work restrictions from her physician and was not disciplined for refusing to clean the shelf. Once Plaintiff's physician set work restrictions, Plaintiff admits that on her own initiative, she lifted a C-fold towel case that weighed

23

more than ten pounds and placed the case on a cart. Plaintiff admits that Hyde told Plaintiff not to be lifting the towel case, with its weight of more than ten pounds.

Plaintiff does not present any evidence that any deficiency in training was due to discriminatory animus on the basis of pregnancy or that non-pregnant research assistants received any training that she was denied. As to Plaintiff's assignments to work with SF9 cells, this work was directly related to the grant that paid Plaintiff and was determined by her doctor not to be a danger. As to Hyde's yelling and rude treatment, Hyde denies those assertions. Assuming these assertions are true, "personality conflicts alone cannot supply a basis for a discrimination claim." Mayberry, 926 F.Supp. at 1324 (citing Ackerman v. Diamond Shamrock Corp., 670 F.2d 66, 70 (6th Cir.1982)). Plaintiff next asserts that she was falsely accused of damaging expensive laboratory equipment. The Court does not discern any causal connection of this allegation to Plaintiff's pregnancy. The Court concludes that Plaintiff lacks any proof of pretext and cannot support a judgment on discrimination.

As to Plaintiff's claim of retaliation for exercising her rights under the FMLA, the FMLA provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by the [FMLA]." 29 U.S.C. § 2165(a)(2). To establish a prima facie retaliation claim under the FMLA, Plaintiff must prove that: (1) she availed herself to a right protected under the FMLA; (2) the exercise of those rights was known to VUMC; (3) she suffered an adverse employment decision; (4) there was a causal connection between her protected activity and the adverse employment action.[4] See, Skrjanc

---

[4] If Plaintiff establishes a prima facie case, the burden the shifts to VUMC to articulate some legitimate non-discriminatory reason for Plaintiff's discharge. If VUMC articulates such a reason, the burden shifts back to Plaintiff to prove that the reason proffered by Vanderbilt was

v. Great Lakes Power Serv. Co., 272 F.3d 309, 314 (6th Cir.2001); Bryant v. Delbar Products, Inc., 18 F.Supp.2d 799, 809 (M.D.Tenn.1998).

"To establish the element of causal link a plaintiff is required to proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir.1997). As a matter of law, the mere fact that Plaintiff's employment was terminated four months after her charge of discrimination does not establish a causal connection. See Randolph v. Ohio Dep't of Youth Servs., 453 F.3d 724, 737 (6th Cir.2006); see also Balmer v. HCA, Inc., 423 F.3d 606, 615 (6th Cir.2005). Some additional proof is required to support a judgment on this claim.

Here, Plaintiff has not presented proof or inferences from proof to show a causal connection between her requesting and taking a leave of absence and her termination. Temporal proximity alone is insufficient to create a jury issue on causation. Little v. BP Exploration & Oil Co., 265 F.3d 357, 363-64 (6th Cir.2001). Here, VUMC counseled Plaintiff about her work performance before her first FMLA leave in November 2005, thereby undermining any inference from the cited temporal proximity between Plaintiff's termination and the protected activity. See Sosby v. Miller Brewing Co., 415 F.Supp.2d 809, 822 (S.D. Ohio 2005) (quoting Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir.2002) ("Evidence that the employer had been concerned about a problem before the employee engaged in protected activity undercuts the significance of the temporal proximity.")).

Plaintiff has a documented pattern of progressive disciplinary action taken against her for work performance issues beginning as early as June 2005, well before Plaintiff ever requested

---

not its true reason, but merely a pretext for discrimination. Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 315 (6th Cir.2001); Stubl v. T.A. Systems, Inc., 984 F.Supp. 1075, 1091 (E.D. Mich. 1997).

FMLA leave. Moreover, Plaintiff has not demonstrated that other employees, particularly those who had not requested FMLA leave, were not also termination for engaging in substantially identical conduct.

As to Plaintiff's claim that Defendant discriminated against her based upon her national origin, Chinese, to prevail on a disparate treatment claim of national original discrimination under Title VII , or the Tennessee Human Rights Act (THRA), the plaintiff must prove that she was a victim of intentional discrimination either through direct proof of discriminatory intent, Trans World Airlines, Inc. v. Thurston, 469 U.S. 111 (1985), or through the indirect, burden-shifting method of proof articulated in McDonnell Douglas. Tennessee courts have held that in claims of discrimination under the Tennessee Human Rights Act, the same standards utilized by the federal courts under Title VII will apply. Campbell v. Florida Steel Corp., 919 S.W.2d 26 (Tenn.1996).

Beyond Plaintiff's membership in a protected class, Plaintiff does not present any evidence of discriminatory animus. "Mere conclusory allegations do not suffice to prove intentional discrimination." based on national origin. Simpson v. Midland-Ross Corp., 823 F.2d 937, 941 (6th Cir.1987). Plaintiff never mentioned national origin discrimination while employed at VUMC, nor cited any statement by anyone at VUMC about her national origin. There is not any proof of another white or non-Asian research assistant who engaged in similar conduct and was not discharged.

For the foregoing reasons, the Court concludes that the Defendant's motion for summary judgment should be granted.

An appropriate Order is filed herewith.

**ENTERED** the _____ day of October, 2007.

WILLIAM J. HAYNES, JR.
United States District Judge

26